## Gay v. American Trading Company.

(Decided February 5, 1918.)

Appeal from Fayette Circuit Court.

1.  Court Commissioners—Reference of Complicated Case to—Practice.—Where a suit in equity involves the settlement of numerous complicated accounts, the chancellor should refer the case to a commissioner to state the accounts and make a report.
2.  Court Commissioners—Appeal and Error—Necessity for Commissioner's Report in Complicated Case.—Where a record involves a settlement of complicated accounts and the judgment of the lower court does not state the reasons for his allowance or rejection of disputed claims, this court will remand the case to the lower court with directions to refer it to a commissioner to state the accounts and simplify the questions so that this court may more readily understand and dispose of them.

GEORGE C. WEBB for appellant.

GEORGE R. HUNT and WALLACE & HARRIS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming on cross-appeal and affirming in part and reversing in part on original appeal.

In 1902, the American Trading Co., a corporation, was organized for the purpose of buying and selling hemp and hemp seed. In December, 1905, the corporation entered into a written agreement with each of the incorpor-

ators, including the appellant, Gay, the agreements being similar in their terms and conditions.

The contract with Gay stipulated that he had subscribed for 130 shares of the capital stock of the company and had agreed to pay therefor one hundred dollars per share as called on. As a further consideration Gay leased to the company his hemp factory at Winchester and the appurtenaces connected therewith for two years from January 1, 1906, and also assigned to it his purchases of hemp.

It was further agreed that Gay should during the term of the lease conduct for the company, subject to its direction, the hemp business at his plant, and in all respects act as the agent of the company in the conduct of its business, which it carried on at his place. He was to pay all the expenses of the business so conducted by him as agent, not including the purchase price of hemp, and as compensation for his services was to be paid by the company a stipulated price. During the existence of the lease Gay agreed that he would not engage in the hemp business on his own account or with any other person, and it was further provided that Gay should, on January 1, 1906, deliver to the company all hemp he then had on hand, or the produce of crops prior to 1905, and the company agreed to accept same and pay therefor certain prices stipulated in the contract.

Pursuant to this agreement, Gay and the other parties purchased and handled hemp and seed for the company, and at the expiration of the term fixed in the contract it was renewed from time to time and continued until and during the year 1909. Whether it was renewed or continued for the year 1910 is in dispute.

It appears that during the first years of its existence the company made considerable money, but beginning in 1909 it had some financial difficulties and finally becoming insolvent it quit business in 1911. In 1912 the trading company brought this suit against Gay seeking to recover from him on account of various items of alleged indebtedness growing out of the contract before mentioned a balance of $9,456.80 alleged to be due it. Accompanying the petition is an itemized account extending from January 2, 1906, to May 31, 1911, showing the items of indebtedness alleged to be due from Gay and the credits to which it was alleged he was entitled, leaving a balance as above stated.

In his answer Gay admitted the execution of the contract and the correctness of the charges against him in the itemized account filed in the petition, except he averred that the charge of 23,359 pounds of hackled tow at $1,-226.34 was incorrect as to the number of pounds and the price at which it was sold, and that the charge should have been $1,236.95 in place of $1,226.34. He claimed, however, that there should be deducted from this $1,236.95 freight, insurance, taxes and expenses, amounting to $461.68, leaving a balance of $775.27.

In his answer Gay also asserted, by way of set-off and counter-claim against the trading company, a claim for $18,227.89 on account of certain debts which he paid, as he alleged, as surety for the trading company; and the issues in respect to this item will be treated separately later in the opinion.

An amended answer, set-off and counter-claim was tendered, and objection to the filing thereof overruled. Complaint is made that the court committed error in allowing this amended pleading to be filed, but in view of the wide discretion allowed as to the filing of amended pleadings, we are not disposed to hold that the court abused its discretion in permitting this amendment to be filed.

In this pleading it was set up that identical contracts were entered into at the same time between the trading company, of the one part, and Gay, Nelson, Logan Brothers & Haggin, Scott, Scott Brothers, the American Hemp Company, Loughridge & Rogers, N. Ford Brent, and George Cogar, of the other part; that the persons named were the only stockholders in the company, and that it was agreed between it and all of said parties that each of them should handle hemp for it and be treated exactly alike and the dealings between it and each of them should be upon the same terms.

In respect to the credits other than those allowed him in the petition filed by the trading company, he said that he was entitled to the following credits: (1) $461.68 on account of freight, insurance and expenses, against the sum of $1,226.34 with which he was charged in the petition on account of tow; (2) $1,369.37, or one cent per pound for 136,937 pounds of tow; (3) that he was charged in the petition with $906.98 on account of Hanover Cord Company; $1,283.37, claim of Columbia Rope Company; and $88.42, on account of Kentucky River Mills Co., or a total of $2,278.77, and that after deducting therefrom

the sum of $1,395.35, on account of expenses, there was a balance of $883.43, which he paid on July 3, 1911, to the Fayette National Bank, to which sum he was entitled as a credit; (4) $1,097.25 for loading and hauling hemp and tow; (5) $450.00, expenses of trips to the East in the years 1906, 1907 and 1908; (6) $150.00, expenses incurred in sending telephone and telegraph messages; (7) $134.65 for rehandling and drying hemp that had become injured by a flood; (8) $650.98, for hauling hemp; (9) $1,983.37, commissions on hemp and tow handled; (10) $165,00, expenses incurred in going to and from Lexington; (11) $2,484.62, on account of loss on hemp occasioned by fire; (12) $1,042.59, on account of tow destroyed in a fire; making a total of $10,825.86, which he pleaded as a counter-claim and set-off against the trading company's claim sued on of $9,456.80, and asked for judgment over against it for the difference between these two sums, or $1,369.06.

In a reply the material averments of this amended pleading were controverted.

On a final hearing of the case the lower court adjudged that Gay was entitled to credits not allowed in the petition for the following amounts: (1) On account of 23,359 pounds of tow, $461.67; (2) for redrying and loading hemp on cars, $568.83; (3) for trips East, $450.00; (4) for rehandling and drying hemp, $134.65; (5) on account of insurance claimed on burnt hemp, $104.25; (6) on account of payment to Fayette National Bank for warehouse receipts, $883.00; making a total of $2,602.40. This sum the court deducted from the $9,456.80 sued for in the petition, and gave a judgment against Gay for the balance. The court also dismissed the set-off and counter-claim of Gay for $18,227.89.

From this judgment Gay prosecutes an appeal, and the trading company a cross-appeal.

The set-off and counter-claim for $18,227.89, asserted by Gay against the trading company grows out of an agreement entered into on July 4, 1911, between the Fayette National Bank, of the first part, and N. Ford Brent, W. B. Nelson, B. S. Gay, and Logan Brothers & Haggin, of the second part. In this agreement it was set out that the American Trading Co. was indebted to the bank upon sundry notes amounting to about $69,000.00; that it was indebted to the First National Bank on notes amounting to approximately $16,000.00; to the Third National Bank on notes amounting to about $16,000.00, the payment of these last two sets of notes aggregating about $32,-

000.00, having been guaranteed by Brent, Nelson, Gay, Logan Brothers & Haggin, and other parties; that the. Union Bank and Trust Co. held notes of the trading company amounting to about $2,750.00, upon which Nelson and Scott were bound; that N. Ford Brent held a note of the trading company for $4,417.59, upon which all of the stockholders of the trading company except himself were bound.

It was further stipulated in the contract that the First National Bank, the Third National Bank, the Union Bank and Trust Company, and Brent should "assign and transfer without recourse to the parties of the second part (namely, Brent, Nelson, Gay and Logan Brothers & Haggin) the paper held by them respectively as above set forth upon the payment to them by the parties of the second part of the full indebtedness evidenced thereby; and the Fayette National Bank is to assign and transfer to the parties of the second part without recourse the said notes upon which Logan Brothers & Haggin and W. B. Nelson are bound upon the payment to it of the full amount of the indebtedness thereby evidenced. The total amount to be so paid by the parties of the second part is approximately $72,911.96, of which one-fourth, or $18,227.89, is to be paid by each of the parties of the second part. Said sum is to be paid to the Fayette National Bank, which hereby agrees to turn over to the other named creditors of the said American Trading Company the amounts coming to them respectively under this agreement, as the same may be collected."

Another clause of the contract specified when and how the amounts agreed to be paid by the parties of the second part should be paid.

In clause four of the contract it was further provided that "The parties of the second part are to procure the passage of a resolution by the board of directors of the American Trading Co. appointing Brent its agent and attorney in fact, with full power to collect and get in and convert into money all of its assets of every kind, and as rapidly as possible. Out of the first money realized from such assets there shall be paid to the Fayette National Bank an overdraft due it by the trading company, and also the additional sum of $3,500.00 to be applied as a credit on its said note of $6,200.00 against the trading company, on which there is no endorser; the proceeds of the remaining assets of said company to be applied first in satisfaction of any subsisting liens and

the residue to be prorated upon the unpaid indebtedness held by the Fayette National Bank against it, the debts assigned as herein provided for to the parties of the second part, and any other valid creditors of said company, each of the foregoing classes of creditors to be entitled to their portion of said assets in the proportions fixed by the proportionate amounts of their respective debts, it being understood that the prorate coming to W. B. Nelson, to Logan Bros. & Haggin, and to D. S. Gay, shall be applied at once as received upon their new indebtedness to the Fayette National Bank as created under this agreement."

In clause five it was set out that "Upon making the payments in full to said Fayette National Bank as herein provided for, each of the parties of the second part respectively shall be thereby released and discharged from all liability of every sort to said bank for or on account of any indebtedness of said company."

In his answer Gay, after setting out this contract, averred that he, as surety for the trading company, undertook to pay to the Fayette National Bank for the use of all the banks $18,227.89, and that he was required to and did pay this amount to the Fayette National Bank, and by reason of the payment of this sum as surety for the trading company, the trading company became and was indebted to him for this sum, with interest, no part of which had been paid.

In its reply the trading company denied that Gay paid any part of the $18,227.89 as surety of the trading company, and averred that this sum was paid by him, and the same amount by Brent, Nelson and Logan Brothers & Haggin, to take up certain notes in consideration of which payments the notes mentioned in the agreement were assigned and transferred to them jointly and are now held by them jointly, and all of said notes are unpaid and in full force and effect.

The company further averred that in June, 1911, the accounts of Gay with the trading company were audited and settled, and it was agreed that he owed it $8,230.00, which he promised to pay. And further averred that the Fayette National Bank was asserting that Gay, Brent, Nelson and Logan Brothers & Haggin, as directors of the trading company, were personally responsible to all of its creditors for debts due by it to them, and had demanded of these parties, who were the only solvent directors, that they pay these debts or they would be

·sued, and that the agreement before mentioned with the Fayette National Bank was made for the purpose of settling the contemplated litigation and to prevent the creditors of the trading company from holding them responsible for its debts; that pursuant to the agreement the trading company passed a resolution appointing Brent its agent, with full power to convert into money all of its assets and pay its debts as stipulated in the agreement; that according to the true intent and meaning of all the parties to the agreement the debt of Gay to the trading company, and for which this suit was instituted, was an asset of the company, and it was agreed that it should be collected and paid out on its indebtedness; and so he should not be allowed to apply the sum paid by him to the bank as a set-off against the amount due by. him to the trading company.

Brent, Nelson and Logan Brothers & Haggin also filed a reply setting out, in substance, the same facts as the reply of the trading company.

In a rejoinder Gay controverted the affirmative matter in the reply of the trading company and in that of Brent, Nelson and Logan Brothers & Haggin.

Restating briefly the contentions of the parties, it is said for Gay that he paid this $18,227.89 under the agreement with the Fayette National Bank as the surety of the trading company, and having so paid it, he is entitled to set-off the amount so paid, or so much thereof as may be needed to extinguish it against the claims asserted by the trading company in this suit.

For the trading company the argument is made: (1) that Gay did not pay this indebtedness as the surety of the trading company, or, if he did, he was precluded by the terms of the contract from setting off the amount he paid against any debt he might owe the trading company, as it was provided in the contract that all assets of the trading company, which included its claim against Gay, should be collected and distributed as provided in the contracts; (2) that it would be inequitable and unjust to his co-parties to the contract who assumed equally with .him the indebtedness of the trading company, and who paid the same amount he did,˙to permit him to set-off the amount he paid against his indebtedness to the trading company and thereby recover from the trading company more than nine thousand dollars of the amount he agreed to pay, when this nine thousand dollars should be distributed as provided in the contract; (3) that the obli-

gations Gay paid with the $18,227.89 as well as the obligations paid by his co-parties, Brent, Nelson and Logan Brothers & Haggin, were assigned and transferred to them without recourse, and the payment of this amount by Gay was in the nature of a compromise and settlement by which Gay was released as director from all liability on account of other debts held by the Fayette National Bank against the trading company.

We think the rights of the parties upon this issue must be determined by the terms of the agreement made by Gay and his co-parties with the Fayette National Bank and that the question whether Gay has the right to set-off the amount paid against his indebtedness to the trading company depends upon the proper construction of this contract.

Summarizing the provisions of this contract, it appears: (1) that the trading company was indebted to the Fayette National Bank and the other banks mentioned in the contract, as well as to Ford Brent, in a large amount of money, evidenced by sundry notes, upon approximately $36,000.00, of which Gay was bound and liable as endorser, surety or guarantor, it is not material which; (2) that when Gay, Brent, Nelson and Logan Brothers & Haggin had paid $72,911.96 in equal parts to the Fayette National Bank, the notes held by the First National Bank and the Third National Bank were to be transferred without recourse to these parties, and the notes held by the Fayette National Bank, upon which Logan Brothers & Haggin and W. B. Nelson were bound, were to be assigned and transferred by it without recourse to these parties; (3) Brent was to be appointed agent or assignee for the benefit of the creditors of the trading company, with power to collect and convert into money all of its assets of every kind as rapidly as possible and pay the money realized from the assets on the debts of the trading company, as stipulated in the contract; (4) that upon the payment by Gay, Brent, Nelson and Logan Brothers & Haggin of the amount they agreed to pay, they were to be released and discharged from all liability to the Fayette National Bank on account of any indebtedness of the trading company to it.

It may also be here said that the indebtedness to the Fayette National Bank mentioned in the contract amounted to approximately $69,000.00, and the indebtedness to the other parties mentioned in the contract to approximately $39,000.00, or a total of approximately $108,-

000.00; so that the $72,911.00, after being applied on the indebtedness mentioned in the contract, would leave a balance unpaid of about $35,000.00. It further appears that after applying this $72,911.00 as payments on the notes mentioned in the contract, the Fayette National Bank would yet hold unsatisfied debts against the trading company amounting to approximately $35,000.00, made up of $8,696.00 upon which Scott Brothers were bound, $7,841.00 upon which J. P. Scott was bound, $13,029.00 upon which the American Hemp Co. was bound, and $6,200.00 upon which there was no surety; and from the payment of this amount Gay and his co-parties were released by the terms of the contract. In short, under the contract the Fayette National Bank agreed that if they would pay $72,911.00, a part of which was to go in payment of the indebtedness it held against the trading company, it would release them from the payment of its other indebtedness against the trading company.

It will further be observed that the trading company was not a party to this contract, which was apparently made by the Fayette National Bank acting for itself and the other banks mentioned in the contract with these men individually in an effort to secure a part of the indebtedness of the trading company to it. Nor does the contract in its express terms pretend to affect in any manner the rights of Gay against the trading company or prevent him by its terms from asserting against it any claim or demand that he might have.

The contract, however, does provide that the trading company, which was controlled, as we may assume, by these parties, was to make, in effect, a general assignment of its assets of every kind to Brent, and it is provided how these assets when collected should be distributed.

There can be no doubt that Gay paid this $18,227.89 as the surety of the trading company, and that upon its payment he had the same right to look to the trading company for reimbursement as any other surety would have to look to his principal to reimburse him for the amount that he had paid as its surety, and the same right that the creditor of an insolvent person, or a person who had made an assignment for the benefit of his creditors, would have to set-off, against any demand the principal or insolvent or assignee for benefit of creditors might present against him, the amount of his demand against the principal or insolvent or assignee, unless it be that

Gay deprived himself of this right when he signed the contract.

When this contract was signed by these four solvent directors of the trading company, who evidently controlled its affairs, they entered into not only an agreement with the Fayette National Bank, but into mutual agreements between themselves. Or, to put it in another way, they agreed to each and all of the stipulations of the contract which imposed upon each of them certain obligations and gave to each of them certain rights.

We do not attach so much importance to the agreement of the banks to assign without recourse to Gay and his associates the paper mentioned in the contract, or to the agreement of the Fayette National Bank to release them from other liability to it. But in the fourth clause of the contract they each agreed ''to collect and get in and convert into money all of the assets of the trading company of every kind and as rapidly as possible''; and they further each agreed how this money when collected should be distributed, and we find from the agreement that after paying out of the money collected to the Fayette National Bank its overdraft of $3,500.00, the remaining assets of the trading company were to be applied, first to satisfy lien debts, and the residue was to be prorated upon the unpaid indebtedness to the Fayette National Bank, and the paper assigned as provided in the contract to themselves and to the payment of other valid debts.

Now it seems to us plain that to permit Gay to extinguish the debt he owed the trading company by allowing his claim against it on account of this $18,227.89 would be to enable him, in the first place, to defeat the terms of the contract describing how the assets of the trading company should be distributed, and in the second place, enable him to collect several thousand dollars of his claim against the trading company, thereby giving him to the extent of his claim that much advantage and preference over his associates. The agreement pointed out specifically what disposition should be made of the assets of the trading company, one of which assets was its claim against Gay, and if Gay should be allowed to divert from the purposes expressed in the writing several thousand dollars of the assets of the trading company to the satisfaction of his debt against it, then it would be permitting him to break in a very substantial way the contract into which he had entered.

Gay had, of course, the right to make this contract. It is not unconscionable or unjust. He and his associates were in serious financial trouble. They mutually agreed with each other and the banks to make the best settlement they could, and as a result of their joint efforts and negotiations they put down in writing what they would do and what the banks would do, and by this writing they must stand.

The fact that Gay may not, at the time this contract was entered into, have known that he owed the trading company anything, or the amount of it, does not in any way affect the construction of the contract, because whatever Gay did owe, whether much or little, was one of its assets, and he agreed that all of its assets, including of course whatever amount he might owe, should be distributed in a clearly specified way.

The contract put these four people on exactly the same footing. Neither of them by its terms was given any advantage or preference over the other. They all agreed that the only part of the money realized from the assets to which they would be entitled was their pro rata part of the debts the contract provided should be assigned to them, although Gay is now attempting to get more than his pro rata part of the assets on this assigned paper.

We think the lower court ruled correctly in dismissing Gay's claim for $18,227.89.

Returning now to the disputed items of account between the trading company and Gay, we have with much labor examined this large and complicated record and are not disposed on this appeal to disturb the finding of the lower court, except in relation to the claim of Gay amounting to $150.00 for telegraph and telephone expenses and his claim for $165.00, expenses incurred in local trips on business of the company. It appears that Gay and his associates were to be treated alike in their dealings with the trading company; that is to say, each was to have credit on his account against the trading company for services and expenses of like character. It further appears that Scott, Nelson and others who occupied the same relation towards the trading company as Gay were allowed credit on their account against it for telephone and telegraph expenses, and each of their claims amounted to more than the one presented by Gay, although it appears that he had occasion to expend in this manner probably as much as they did. It further ap-

pears that they kept a statement of these expenses, but that Gay, not knowing at the time these expenses were created by him that his associates were charging for similar expenses, did not keep any itemized account; but he testifies very positively that he expended certainly as much as $150.00 for telephone and telegraph expenses, and if so, he should be allowed credit by this amount.

In answer to this claim the argument is made that as Gay did not keep any account of these expenses and his estimate of them is a mere guess on his part, the court properly rejected his claim.

We think, however, that if Gay did not know that his associates were keeping an account of this class of expenses and charging for them until he discovered that they were upon an examination of the books, and believing that they were not keeping an account, he did not keep one, this should not deny him the right to be put on an equal footing with his associates by allowing him credit by these expenses. It is true that the amount of these expenses paid out by him is a mere estimate, but he testifies that it was at least $150.00, and as this amount is considerably less than the others received credit by for like expenses, we are inclined to think that he should have credit by the amount he claims.

Substantially the same condition of affairs exists in relation to his claim of $165.00 for traveling expenses to Lexington as exists with reference to his claim for telephone and telegraph expenses, and as his associates were allowed their expenses for local trips made in the conduct of the business with the trading company, it seems to us that Gay should be allowed his expenses; and so we think he should have credit for $165.00 on this account.

Gay also asserted two claims on account of the 1910 hemp crop; one amounting to $2,484.62 for alleged loss sustained by him on account of this crop, and the other a claim for $1,042.59 on account of loss sustained in 1910 by reason of a fire that destroyed a quantity of tow.

For some reason the lower court did not have this case referred to a commissioner and the judgment does not give us any light on the reasons that influenced the court to reject these two claims of Gay. The evidence and pleadings relating to these claims are scattered about in this large record, and we do not feel that, without giving to it more time than should be taken considering the condition of our docket, we could reach a satisfactory

conclusion. We have, therefore, determined to remand the case to the lower court as to these two items, with directions to the court to refer them to a commissioner with instructions to make a full and itemized report touching these two items, accompanied by the evidence relating thereto or a reference to the pages where it can be found. If, however, the court sees proper to himself examine the record and make such a report in the form of a judgment as we have indicated, of course that would answer the same purpose here on another appeal as the report of a commissioner.

In this connection we are tempted to express some surprise that the judge of the lower court did not have this case referred to a commissioner instead of assuming himself the great labor necessarily involved in an effort to arrive at a correct conclusion in respect to the numerous and complicated items in issue between these parties. And we take the liberty of here suggesting to trial judges generally that it would not only be of much benefit to the lower court, but to this court, to have the assistance of a commissioner's report where there are in dispute numerous items of account. For example, if this case had been referred to a commissioner with directions not only to state the accounts between the parties, but to submit with his report the evidence bearing upon each item, or the pages on which it could be found, and his conclusions thereon, leaving to the parties the right to file such exceptions as they desired to the finding on each item, it would, we think, have lessened very much the labor of the lower court and also have been of much help to this court.

The judgment on the cross-appeal is affirmed. The judgment on the original appeal is also affirmed, except as to the items of $150.00 and $165.00, and as to these two items it is reversed, with directions to give Gay credit by the amount of these items. As to the two claims asserted by Gay heretofore mentioned growing out of the 1910 crop, we express no opinion as to the correctness of the judgment rejecting these claims, and in respect to them the court will follow the directions indicated.